UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

YVONNE WATTS,

                        Plaintiff,

-vs-                                                    Case No. 6:04-cv-1219-Orl-PCF-JGG

JO ANNE B. BARNHART,
Commissioner of Social Security,

                        Defendant.
_____/

## REPORT AND RECOMMENDATION

        Plaintiff Yvonne Watts ["Watts"] appeals to the district court from a final decision of the

Commissioner of Social Security [the "Commissioner"] denying her application for a period of

disability and disability insurance benefits.  R. 22.  For the reasons set forth below, the

Commissioner's decision should be **REMANDED**.

## I.       PROCEDURAL HISTORY

        On February 8, 2001, Watts filed an application for a period of disability and disability

insurance benefits, claiming disability as of September 24, 2000 due to diabetes with neuropathy

and high blood pressure.  R. 22 - 23.  Her applications were denied initially and upon

reconsideration.  On December 17, 2002, the Honorable James R. Ciaravino, Administrative Law

Judge ("the ALJ") held a hearing on Watts's claim in Orlando, Florida.  R. 284.  The ALJ heard

-1-

testimony from Watts and her husband, George.  R. 284.  Watts was represented at the hearing by June Williamson, a paralegal.  R. 287.

On May 28, 2003, the ALJ issued his decision that Watts was not entitled to benefits. Following a review of the medical and other record evidence, the ALJ found that Watts suffered from insulin dependent diabetes mellitus ("IDDM"), polyarthalgias,[1] osteoporosis with positive ANA, status post left carpal tunnel release and adjustment disorder.  R. 23.  He found that Watts retained the residual functional capacity to perform her past relevant work as a housekeeper.  R. 26.  The ALJ found that Watts had not been under a disability, as defined in the Social Security Act, at any time through the date of the decision.  R. 27, Finding 10.

Watts requested a review of the decision from the Appeals Council on August 8, 2003.  R. 17 - 18.  On July 1, 2004, after considering additional medical evidence — medical records from C.D. Chacko, M.D. and Gregory Samano D.O., R. 8 — the Appeals Council denied review.  R. 5. Thereafter, Watts sought review from the U.S. District Court, Middle District of Florida.  On March 1, 2005, Watts filed her memorandum in opposition to the Commissioner's decision. Docket No. 11.  On May 2, 2005, the Commissioner filed her memorandum in support of the decision.  Docket No. 12.  The appeal is now ripe for determination.

## II.    THE PARTIES' POSITIONS

Watts assigns four errors to the Commissioner.  First, Watts claims that the Commissioner's decision was not based on substantial evidence.  Docket No. 11 at 1.  Second,

---

[1] Multiple instances of pain in a joint, especially ones not inflammatory in character.  STEDMAN'S MEDICAL DICTIONARY 148 (26th ed., 1990) (hereinafter "STEDMAN'S").

Watts claims that the Commissioner failed to properly evaluate her subjective complaints of pain. Docket No. 11 at 1. Third, Watts claims that the Commissioner failed to give sufficient weight to the testimony of one of her treating physicians. Docket No. 11 at 1. Finally, Watts contends that the Commissioner failed to properly consider the impact of her obesity on her ability to work. Docket No. 11 at 1.

The Commissioner argues that substantial evidence supports both her decision to deny disability and the ALJ's assessment of Watts's credibility. Docket No. 12 at 3 - 6. The Commissioner also argues that the treating physician's opinion was not supported by his own notes. Docket No. 12 at 6. Finally, the Commissioner contends that nothing in the record suggests that Watts's obesity imposed significant work-related limitations. Docket No. 12 at 7.

## III.   THE STANDARD OF REVIEW

### A.   Affirmance

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405 (g). Substantial evidence is more than a scintilla — i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), *citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *accord*, *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if

the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991).  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.  *Foote*, 67 F.3d at 1560; *accord*, *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).

### B.    Reversal and Remand

Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause.  42 U.S.C. § 405 (g)(Sentence Four).  The district court will reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.  *Keeton v. Department of Health and Human Services*, 21 F.3d 1064, 1066 (11th Cir. 1994); *accord Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).  This Court may reverse the decision of the Commissioner, and order an award of disability benefits, where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt.  *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord*, *Bowen v. Heckler*, 748 F.2d 629, 631, 636 - 37 (11th Cir. 1984).

The district court may remand a case to the Commissioner for a rehearing under sentence four of  42 U.S.C. § 405 (g); under sentence six of 42 U.S.C. § 405 (g); or under both sentences.

*Jackson v. Chater*, 99 F.3d 1086, 1089 - 92, 1095, 1098 (11th Cir. 1996).  To remand under

sentence four, the district court must either find that the Commissioner's decision is not supported

by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the

disability claim.  *Jackson*, 99 F.3d at 1090 - 91 (remand appropriate where ALJ failed to develop a

full and fair record of claimant's residual functional capacity); *accord Brenem v. Harris*, 621 F.2d

688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was

insufficient for district court to find claimant disabled).

Where the district court cannot discern the basis for the Commissioner's decision, a

sentence-four remand may be appropriate to allow the Commissioner to explain the basis for his

decision.  *Falcon v. Heckler*, 732 F.2d 872, 829 - 30  (11th Cir. 1984) (remand was appropriate to

allow ALJ to explain his basis for determining that claimant's depression did not significantly

affect her ability to work) (treating psychologist acknowledged that claimant had improved in

response to treatment and could work in a supportive, non-competitive, tailor-made work

environment).  On remand under sentence four, the ALJ should review the case on a complete

record, including any new material evidence.  *Diorio v. Heckler*, 721 F.2d 726, 729 (11th Cir.

1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council);

*Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (ALJ should consider on remand the

need for orthopedic evaluation).  After a sentence-four remand, the district court enters a final and

appealable judgment immediately, and then loses jurisdiction.  *Jackson*, 99 F.3d at 1089, 1095.

In contrast, sentence six of 42 U.S.C. § 405 (g) provides:

> The court . . . may at any time order additional evidence to be taken before the
> Commissioner of Social Security, but only upon a showing that there is new

-5-

evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding;

42 U.S.C. § 405 (g).  To remand under sentence six, the claimant must establish:  1.) that there is

new, non-cumulative evidence; 2.) that the evidence is material —  relevant and probative so that

there is a reasonable possibility that it would change the administrative result; and 3.) there is good

cause for failure to submit the evidence at the administrative level.  *See Jackson*, 99 F.3d at 1090 -

92;  *Cannon v. Bowen*, 858 F.2d 1541, 1546 (11th Cir. 1988); *Smith v. Bowen*, 792 F.2d 1547,

1550 (11th Cir. 1986); *Caulder v. Bowen*, 791 F.2d 872, 877 (11th Cir. 1986); *see also Keeton v.

Dept. of Health and Human Serv.*, 21 F.3d 1064, 1068 (11th Cir. 1994).

A sentence-six remand may be warranted even in the absence of an error by the

Commissioner if new, material evidence becomes available to the claimant.  *Jackson*, 99 F.3d at

1095.  With a sentence-six remand, the parties must return to the district court after remand to file

modified findings of fact.  *Jackson*, 99 F.3d at 1095.  The district court retains jurisdiction pending

remand, and does not enter a final judgment until after the completion of remand proceedings.[2]  *Id.*

**C.     Standard of Review for Evidence Evaluated by Appeals Council**

After the ALJ's decision —  but before the Appeals Council decision — Watts submitted

additional medical records from one of her psychiatrists covering the period from February 2002

through June 2003,  R. 262 - 68, and additional medical records from an osteopath covering the

period from August 2001 to July 2002, R. 269 - 78.  The Appeals Council properly made them a

---

[2]The time for filing an application for attorneys fees under the Equal Access to Justice Act, 28 U.S.C. § 2412 ["EAJA"] differs in remands under sentence four and sentence six.  *Jackson*, 99 F.3d at 1089, 1095 n.4 and surrounding text.  In a sentence-four remand, the EAJA application must be filed after the entry of judgment before the district court loses jurisdiction.  *Id.*  In a sentence-six remand, the time runs from the post-remand entry-of-judgment date in the district court.  *Id.*

part of the record, and also considered them in denying review.  R. 8.  The district court also must consider the new evidence in determining whether the Commissioner erred in denying review of the ALJ's decision.

Congress left the term "final decision" undefined in 42 U.S.C. § 405 (g).  Where a claimant exhausts his administrative remedies by requesting review by the Appeals Council and the Appeals Council then denies review,  the Appeals Council's order denying review is a "final decision" of the Commissioner under § 405 (g).  *Sims v. Apfel*, 530 U.S. 103, 120 S.Ct. 2080, 2083 (2000); *accord Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).  The Appeals Council "will" review a case if there appears to be an abuse of discretion by the ALJ, if there is an error of law, or if the ALJ's action, findings, or conclusions are not supported by substantial evidence.  20 C.F.R. § 416.1470; *Sims*, 120 S.Ct. at 2086; *see also, Parker v. Bowen*, 788 F.2d 1512, 1518 (11th Cir. 1986) (en banc).  The Appeals Council's denial of review is subject to judicial review to determine if it is supported by substantial evidence.  *Sims*, 120 S.Ct. at 2086.

Just as the ALJ has a duty to investigate the facts and to develop the arguments both for and against the granting of benefits, the Appeals Council's  review is similarly broad.  *Sims v. Apfel*, 530 U.S. 103, 120 S.Ct. 2080, 2085 (2000).  The Appeals Council, not the claimant, has the primary responsibility for identifying and developing the issues.  *Sims*, 120 S.Ct. at 2086.  When the Appeals Council refuses to consider new evidence submitted to it and denies review, the Appeals Council's decision denying review is subject to judicial review.  20 C.F.R. § § 404.970 (b); 416.1470 (b); *Sims*, 120 S.Ct. at 2086;  *Keeton v. Department of Health and Human*

-7-

*Services*, 21 F.3d 1064, 1066 (11th Cir. 1994).  Furthermore, the Appeals Council commits

reversible error when it refuses to consider new evidence and then denies review.  *Keeton*, 21

F.3d at 1066.  Similarly, it is *reversible error* for a district court to consider only the evidence

presented to the ALJ — and to ignore the new evidence presented to the Appeals Council — in

reviewing a decision of the Appeals Council.  *Keeton*, 21 F.3d at 1066.

The Appeals Council must consider and evaluate new evidence to determine whether

there is a basis for changing the ALJ's decision.  *Sims*, 120 S.Ct. at 2086;  *Falge v. Apfel*, 150

F.3d 1320, 1322 n. 4 (11th Cir. 1998).  When the Appeals Council has denied review, the district

court looks only to the evidence actually presented to the ALJ in determining whether the *ALJ's*

*decision* is supported by substantial evidence.  *Falge*, 150 F.3d at 1323; *accord, Eads v. Secretary*

*of Health and Human Services*, 983 F.2d 815, 817 (7th Cir. 1993) (ALJ cannot be faulted for

failure to weigh evidence never presented to him).

Nevertheless, there is an important difference between *Falge* and this case — a difference

stressed by the United States Court of Appeals for the Eleventh Circuit.  In *Falge*, the claimant

did not appeal the Appeals Council's decision to deny review.  Instead he appealed only the

*ALJ's decision* to deny benefits.  150 F.3d at 1324.  In this case, however, the claimant does

expressly appeal and seek a reversal of the Appeals Council's decision to deny review.  Docket

No. 1 at 1.  The Eleventh Circuit directs the district courts to consider evidence submitted to the

Appeals Council in reviewing the Appeals Council's denial of review.  *Falge*, 150 F.3d at 1324;

*Keeton*, 21 F.3d at 1066; *accord, Higgenbotham v. Barnhart*, 405 F.3d 332 (5th Cir. 2005).

Indeed, it makes sense that Congress has provided for judicial review of the Commissioner's final decision — the last step of review necessary to exhaust administrative remedies. When the Appeals Council refuses to consider new evidence submitted to it, the Appeals Council's decision denying review is subject to judicial review for error. *Sims*, 120 S.Ct. at 2086; *Keeton*, 21 F.3d at 1066. Similarly, when the Appeals Council denies review of an ALJ's decision after receiving, considering, and evaluating new and material evidence that clearly and thoroughly undermines the ALJ's findings of fact and conclusions of law, the Appeals Council's decision denying review also must be subject to judicial review for error. *See Falge*, 150 F.3d at 1324; *Keeton*, 21 F.3d at 1066, 1068; 20 C.F.R. § 404.970 (b) (Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the relevant period, and it will then review the case if it finds that the ALJ's action, findings, or conclusion is contrary to the weight of the evidence currently of record). The Commissioner cannot avoid judicial review of the Appeals Council's decision to deny review by considering but not acting on new evidence that is highly probative of disability, or by considering but not acting on evidence that shows in retrospect that an ALJ's action, findings, or conclusion are contrary to the weight of the evidence currently of record.

In this case, the claimant has appealed an unfavorable decision to the Appeals Council as a necessary step in exhausting administrative remedies. The Appeals Council has considered claimant's additional evidence in light of the issues raised in the request for review, has considered the applicable statutes and regulations, has considered the ALJ's decision, and has issued a written final decision determining that the ALJ neither erred nor abused his discretion,

and determining that the ALJ's findings are supported by substantial evidence.  The Appeals

Council's determination is subject to judicial review.  The Commissioner cannot avoid judicial

review of the Appeals Council's final decision by passing a regulation defining the term "final

decision of the Commissioner of Social Security" in 42 U.S.C. § 405 (g) as the decision of the

ALJ, and by calling the Appeals Council's final decision a "denial of review."  *See Sims*, 120

S.Ct. at 2086;  *accord Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983) (Appeals

Council's denial of review was a judicially reviewable final decision under 42 U.S.C. § 405 (g)).

## IV.     THE LAW

The law defines disability as the inability to do any substantial gainful activity by reason

of any medically determinable physical or mental impairment which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not less than

twelve months.  42 U.S.C. §§ 416 (i), 423 (d)(1); 20 C.F.R. § 404.1505.  The impairment must be

severe, making the claimant unable to do his or her previous work, or any other substantial

gainful activity which exists in the national economy.  42 U.S.C. § 423 (d)(2); 20 C.F.R. §§

404.1505 - 404.1511.

### A.        Treating Physicians

Substantial weight must be given to the opinion, diagnosis and medical evidence of a

treating physician unless there is good cause to do otherwise.  *See Lewis v. Callahan*, 125 F.3d

1436, 1439 - 1441 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991);

*Sabo v. Commissioner of Social Security*,  955 F.Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. §

404.1527 (d).  If a treating physician's opinion on the nature and severity of a claimant's

impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.  20 C.F.R. § 404.1527 (d)(2).  The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  *See Edwards*, 937 F.2d 580 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).

Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also Schnor v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).  When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on the 1.) length of the treatment relationship and the frequency of examination; 2.) the nature and extent of the treatment relationship; 3.) the medical evidence supporting the opinion; 4.) consistency with the record a whole; 5.) specialization in the medical issues at issue; 6.) other factors which tend to support or contradict the opinion.  20 C.F.R. § 404.1527 (d).  However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.  *See Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir.1984); *see also* 20 C.F.R. § 404.1527 (d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  However, the ALJ is responsible for

making the ultimate determination about whether a claimant meets the statutory definition of disability.  20 C.F.R. § 404.1527 (e).  The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors because that ultimate determination is the providence of the Commissioner.  20 C.F.R. § 404.1527 (e).

### B.    Developing the Record

The ALJ has a duty to fully and fairly develop the record.  *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988); *Cowart v. Schweiker*, 662 F.2d 731, 735 - 36 (11th Cir. 1981).  The Commissioner also has a duty to notify a claimant of the statutory right to retained counsel at the social security hearing, and to solicit a knowing and voluntary waiver of that right.  *See* 42 U.S.C.§ 406; *Cowart*, 662 F.2d at 734.  The obligation to fully and fairly develop the record exists if a claimant has waived the right to retained counsel, and even if the claimant is represented by counsel.  *See Cowart*, 662 F.2d at 735 - 36.  However, where an unrepresented claimant has not waived the right to retained counsel, the ALJ's obligation to develop a full and fair record rises to a special duty.  *See Brown v. Shalala*, 44 F.3d 931, 934 - 35 (11th Cir. 1995), *citing Smith v. Schweiker*, 677 F.2d 826, 829 (11th Cir. 1982).  This special duty requires the ALJ to "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts" and to be "especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited."  *Cowart*, 662 F.2d at 735 (citations omitted).

**C.**     **Medical Tests and Examinations**

The ALJ is required to order additional medical tests and exams only when a claimant's

medical sources do not give sufficient medical evidence about an impairment to determine

whether the claimant is disabled.  20 C.F.R. § 416.917; *see also Conley v. Bowmen*, 781 F.2d

143, 146 (8th Cir. 1986).  In fulfilling his duty to conduct a full and fair inquiry, the ALJ is not

required to order a consultative examination unless the record establishes that such an

examination is necessary to enable the ALJ to render an informed decision.  *Holladay v. Bowen*,

848 F.2d 1206, 1209 (11th Cir. 1988); *Reeves v. Heckler*, 734 F.2d 519, 522 n. 1 (11th Cir. 1984)

(failure to order such an evaluation may be reversible error).  Under the regulations, however, the

ALJ may determine that a consultative examination or other medical tests are necessary.  20

C.F.R. § 416.917 (1998).

**D.**     **The Five Step Evaluation**

The ALJ must follow five steps in evaluating a claim of disability.  *See* 20 C.F.R. §§

404.1520,  416.920.  First, if a claimant is working at a substantial gainful activity, she is not

disabled.  20 C.F.R. § 404.1520 (b).  Second, if a claimant does not have any impairment or

combination of impairments which significantly limit his or her physical or mental ability to do

basic work activities, then she does not have a severe impairment and is not disabled.  20 C.F.R.

§ 404.1520 (c).  Third, if a claimant's impairments meet or equal an impairment listed in 20

C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.  20 C.F.R. § 404.1520 (d).  Fourth, if a

claimant's impairments do not prevent him or her from doing past relevant work, she is not

disabled.  20 C.F.R. § 404.1520 (e).  Fifth, if a claimant's impairments (considering his or her

residual functional capacity, age, education, and past work) prevent him or her from doing other work that exists in the national economy, then claimant is disabled.  20 C.F.R. § 404.1520 (f).

In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments, and must consider any medically severe combination of impairments throughout the disability determination process.  42 U.S.C. § 423 (d)(2)(B).  The ALJ must evaluate a disability claimant as a whole person, and not in the abstract as having several hypothetical and isolated illnesses. *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993).  Accordingly, the ALJ must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled.  *See id.*, 985 F.2d at 534.

The claimant has the burden of proving the existence of a disability as defined by the Social Security Act.  *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991).  The claimant must prove disability on or before the last day of his or  her insured status for the purposes of disability benefits.  *Ware v. Schweiker*, 651 F.2d 408, 411 (5th Cir. 1981); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979); 42 U.S.C. §§ 416 (i)(3); 423(a), (c).  If a claimant becomes disabled after the claimant has lost insured status, his or her claim for disability benefits must be denied despite the disability.  *See, e. g., Kirkland v. Weinberger*, 480 F.2d 46 (5th Cir. 1973); *Chance v. Califano*, 574 F.2d 274 (5th Cir. 1978).

### E.      The Evaluation of Mental Disorders

The evaluation of disability on the basis of mental disorders requires the documentation of a medically determinable impairment, as well as consideration of the degree of limitation such

impairment may impose on the individual's ability to work.  The listings for mental disorders are arranged in nine diagnostic categories.  20 C.F.R. Pt. 404, Subpt. P, App. 1.   The criteria in paragraphs B and C of the listings for mental disorders describe those functional limitations associated with mental disorders which are incompatible with the ability to work — i.e. limitations in functional areas deemed essential to work.  A mental impairment is medically equivalent to a listed mental impairment if the medical findings are at least equal in severity and duration to the listed findings.  20 C.F.R. § 404.1526.  An individual meeting or equaling the criteria could not reasonably be expected to engage in gainful work activity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

Individuals who have an impairment with a level of severity which does not meet the criteria of the listings for mental disorders may or may not have the residual functional capacity ["RFC"] which would enable them to engage in substantial gainful work activity.  The determination of mental RFC is crucial to the evaluation of an individual's capacity to engage in substantial gainful work activity when the criteria of the listings for mental disorders are not met or equaled, but the impairment is nevertheless severe.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

For mental disorders, severity is assessed in terms of the functional limitations imposed by the impairment.  Functional limitations are assessed using the criteria in paragraph B of the listings for mental disorders (activities of daily living; social functioning;  concentration, persistence, or pace;  and ability to tolerate increased mental demands associated with competitive work).  A "marked" degree of limitation means more than moderate, but less than extreme.  A marked limitation may arise when several activities or functions are impaired or even

-15-

when only one is impaired, so long as the degree of limitation is such as to seriously interfere with the ability to function independently, appropriately and effectively.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The Commissioner employs a technique to ensure that ALJ's obtain, consider, and properly evaluate all evidence needed to evaluate mental impairment severity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The technique is used in connection with the sequential evaluation process.  *See* 20 C.F.R. §§ 404.1520a and 416.920a.

The presence of a mental disorder should be documented primarily on the basis of reports from individual providers, such as psychiatrists and psychologists, and facilities such as hospitals and clinics.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Information from both medical and non-medical sources may be used to obtain detailed descriptions of the individual's activities of daily living;  social functioning;  concentration, persistence and pace;  or ability to tolerate increased mental demands (stress).  This information can be provided by programs such as community mental health centers, day care centers, and family members who have knowledge of the individual's functioning.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  In some cases descriptions of activities of daily living or social functioning given by individuals or treating sources may be insufficiently detailed and/or may be in conflict with the clinical picture otherwise observed or described in the examinations or reports.  It is necessary to resolve any inconsistencies or gaps that may exist in order to obtain a proper understanding of the individual's functional restrictions.

An individual's level of functioning may vary considerably over time.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The level of functioning at a specific time may seem relatively adequate or, conversely, rather poor.  Proper evaluation of the impairment must take any variations in level of

functioning into account in arriving at a determination of impairment severity over time.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Thus, it is vital to obtain evidence from relevant sources over a sufficiently long period prior to the date of adjudication in order to establish the individual's impairment severity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  This evidence should include treatment notes, hospital discharge summaries, and work evaluation or rehabilitation progress notes if these are available.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Some individuals may actually have worked during the period of time pertinent to the determination of disability.  Information concerning the individual's behavior during any attempt to work and the circumstances surrounding termination of the work effort are particularly useful in determining the individual's ability or inability to function in a work setting.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

Particular problems are often involved in evaluating mental impairments in individuals who have long histories of repeated hospitalizations or prolonged outpatient care with supportive therapy and medication.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Individuals with chronic psychotic disorders commonly have their lives structured in such a way as to minimize stress and reduce their signs and symptoms.  Such individuals may be much more impaired for work than their signs and symptoms would indicate.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The results of a single examination may not adequately describe these individuals' sustained ability to function.  It is, therefore, vital to review all pertinent information relative to the individual's condition, especially at times of increased stress.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  It is mandatory to attempt to obtain adequate descriptive information from all sources which have treated the individual either currently, or in the time period relevant to the decision.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

-17-

Attention must be given to the effect of medication on the individual's signs, symptoms and ability to function. 20 C.F.R. Pt. 404, Subpt. P, App. 1. While psychotropic medications may control certain primary manifestations of a mental disorder, e.g., hallucinations, such treatment may or may not affect the functional limitations imposed by the mental disorder. 20 C.F.R. Pt. 404, Subpt. P, App. 1. In cases where overt symptomatology is attenuated by the psychotropic medications, particular attention must be focused on the functional restrictions which may persist. These functional restrictions are also to be used as the measure of impairment severity. 20 C.F.R. Pt. 404, Subpt. P, App. 1.

In some cases, the evidence shows that an individual's impairments are subject to temporary remission. In assessing whether medical improvement has occurred in persons with this type of impairment, the ALJ will consider the longitudinal history of the impairments, including the occurrence of prior remission, and prospects for future worsening. Improvement in such impairments that is only temporary will not warrant a finding of medical improvement. 20 C.F.R. § 404.1594 (iv).

The Listing for Affective Disorders is as follows:

**12.04** **<u>Affective Disorders</u>**: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.
The required level of severity for these disorders is met when the requirements in both A and B are satisfied.
A.      Medically documented persistence, either continuous or intermittent, of one of the following:
                1. Depressive syndrome characterized by at least four of the following:
                a. Anhedonia or pervasive loss of interest in almost all activities; or

b. Appetite disturbance with change in weight;  or
c. Sleep disturbance;  or
d. Psychomotor agitation or retardation;  or
e. Decreased energy;  or
f. Feelings of guilt or worthlessness;  or
g. Difficulty concentrating or thinking;  or
h. Thoughts of suicide;  or
i. Hallucinations, delusions or paranoid thinking;  or

2. Manic syndrome characterized by at least three of the following:
a. Hyperactivity;  or
b. Pressure of speech;  or
c. Flight of ideas;  or
d. Inflated self-esteem;  or
e. Decreased need for sleep;  or
f. Easy distractibility;  or
g. Involvement in activities that have a high probability of painful consequences which are not recognized;  or
h. Hallucinations, delusions or paranoid thinking;
or

3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);
AND
B.     Resulting in at least two of the following:
1. Marked restriction of activities of daily living;  or
2. Marked difficulties in maintaining social functioning;  or
3. Deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner (in work settings or elsewhere); or
4. Repeated episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors).

20 C.F.R. Pt. 404, Subpt. P, App. 1.

An individual may meet the separate Listing for mental retardation if he or she meets the

diagnostic description for mental retardation, has a valid verbal, performance, or full scale IQ of

60 through 70, and has a physical or other mental impairment imposing additional and significant

work- related limitation of function.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.

   **F.**   **Other Work**

   Once the ALJ finds that a claimant cannot return to his or her prior work, the burden of

proof shifts to the Commissioner to establish that the claimant could perform other work that

exists in the national economy.  *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995).  In

determining whether the Commissioner has met this burden, the ALJ must develop a full record

regarding the vocational opportunities available to a claimant.  *Foote*, 67 F.3d at 1558; *Allen v.*

*Sullivan*, 880 F.2d 1200, 1201 (11th Cir. 1989).  This burden may sometimes be met through

exclusive reliance on the Medical-Vocational Guidelines [the "grids"].  *Foote,* 67 F.3d at 1558.

Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an

exertional impairment, without significant non-exertional factors.  20 C.F.R. Part 404, Subpart P,

Appendix 2, § 200.00 (e); *Foote*, 67 F.3d at 1559; *Heckler v. Campbell*, 461 U.S. 458 (1983)

(exclusive reliance on the grids is appropriate in cases involving only exertional impairments,

impairments which place limits on an individual's ability to meet job strength requirements).

   Exclusive reliance is not appropriate "either when a claimant is unable to perform a full

range of work at a given residual functional level or when a claimant has a non-exertional

impairment that significantly limits basic work skills."  *Walker v. Bowen*, 826 F.2d 996, 1002-03

(11th Cir. 1987).  In almost all of such cases, the Commissioner's burden can be met only

through the use of a vocational expert.  *Foote*, 67 F.3d at 1559; *Chester v. Bowen*, 792 F.2d 129,

132 (11th Cir. 1986); *see also MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986) (when

non-exertional limitations are alleged, the preferred method of demonstrating that the claimant

can perform specific work is through the testimony of a vocational expert).  It is only when the

claimant can clearly do unlimited types of work at a given residual functional level that it is

unnecessary to call a vocational expert to establish whether the claimant can perform work which

exists in the national economy.  *See Allen v. Sullivan*, 880 F.2d 1200, 1202 (11th Cir. 1989);

*Ferguson v. Schweiker*, 641 F.2d 243, 248 (5th Cir. 1981).  In any event, the ALJ must make a

specific finding as to whether the non-exertional limitations are severe enough to preclude a wide

range of employment at the given work capacity level indicated by the exertional limitations.

*Foote*, 67 F.3d at 1559.

### 1.   Pain

Pain is a non-exertional impairment.  *Foote*, 67 F.3d at 1559; 826 F.2d at 1003.  Congress

has determined that a claimant will not be considered disabled unless he furnishes medical and

other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical

impairment which could reasonably be expected to produce the pain or symptoms alleged.  42

U.S.C. § 423 (d)(5)(A).  The ALJ must consider all of a claimant's statements about his

symptoms, including pain, and determine the extent to which the symptoms can reasonably be

accepted as consistent with the objective medical evidence.   20 C.F.R. § 404.1529.  In

determining whether the medical signs and laboratory findings show medical impairments which

reasonably could be expected to produce the pain alleged, the ALJ must apply the Eleventh

Circuit's three-part "pain standard":

> The pain standard requires (1) evidence of an underlying medical condition and
> either (2) objective medical evidence that confirms the severity of the alleged pain

-21-

> arising from that condition or (3) that the objectively determined medical
> condition is of such a severity that it can be reasonably expected to give rise to the
> alleged pain.

*Foote,* 67 F.3d at 1560, *quoting Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).  Pain

alone can be disabling, even when its existence is unsupported by objective evidence, *Marbury v.*

*Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992), although an individual's statement as to pain is not,

by itself, conclusive of disability.  42 U.S.C. § 423 (d)(5)(A).

### 2.    <u>Credibility</u>

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must

articulate specific and adequate reasons for doing so, or the record must be obvious as to the

credibility finding.  *Foote,* 67 F.3d at 1561-62*; Jones v. Department of Health and Human*

*Services*, 941 F.2d 1529, 1532 (11th Cir. 1991) (articulated reasons must be based on substantial

evidence).  A reviewing court will not disturb a clearly articulated credibility finding with

substantial supporting evidence in the record.  *See Hale v. Bowman,* 831 F.2d 1007, 1012 (11th

Cir. 1987); *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986).  As a matter of law, the

failure to articulate the reasons for discrediting subjective pain testimony requires that the

testimony be accepted as true.  *Foote,* 67 F.3d at 1561-62*; Cannon v. Bowen*, 858 F.2d 1541,

1545 (11th Cir. 1988).

A lack of a sufficiently explicit credibility finding becomes a ground for remand when

credibility is critical to the outcome of the case.  *See Smallwood v. Schweiker*, 681 F.2d 1349,

1352 (11th Cir. 1982).  If proof of disability is based on subjective evidence and a credibility

determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such

testimony or the implication must be so clear as to amount to a specific credibility finding." *Foote v. Chater*, 67 F.3d at 1562 (quoting *Tieniber v. Heckler*, 720 F.2d 1251, 1255 (11th Cir.1983) (although no explicit finding as to credibility is required, the implication must be obvious to the reviewing court).

## V.   APPLICATION AND ANALYSIS

### A.   The Facts

Notes from Family Practice Specialists on September 5, 2000 indicate that Watts complained of pain over the left rib area and difficulty breathing.  R. 127.  The diagnoses was IDDM, neuropathy and hypertension.  R. 128.  On September 19, 2000, Watts reported to Family Practice Specialists that she was having a lot of chest pain and trouble sleeping.  R. 126.

Watts went to Winter Park Memorial Hospital on September 24, 2000 as a result of increasing shortness of breath over the preceding three or four days.  Examination revealed Watts was hypertensive and in diabetic ketoacidosis[3].  She was admitted to the intensive care unit and placed on an insulin drip.  She was also prescribed Captopril for hypertension.  An EKG revealed sinus tachycardia[4] and nonspecific ST-T wave abnormalities.  She was discharged on September 28, 2000 with a diagnosis of diabetic ketoacidosis, hypertension and hypokalemia.[5]  R. 104 - 07.

At the Diabetes and Endocrine Center on October 2, 2000, Watts reported she had been suffering excessive thirst and blurred vision, as well as numbness and tingling in her hands and

---

[3]Acidosis, as in diabetes or starvation, caused by the enhanced production of ketone bodies.  STEDMAN'S at 917.

[4]Rapid beating of the heart, conventionally applied to rates over 100 beats/minutes.  STEDMAN'S at 1758.

[5]The presence of an abnormally small amount of potassium ions in the blood.  STEDMAN'S at 836.

feet.  Notes also indicated she had chronic GI symptoms of nausea and vomiting, hypertension

and exogenous obesity.  R. 192 - 94.  Watts went to the Florida Eye Clinic on October 13, 2000

with blurred vision.  The diagnosis was IDDM and hyperopia.[6]  R. 121.

According to a follow-up letter dated October 16, 2000 from Maha Zikra, M.D. of the

Diabetes and Endocrine Center of Florida to Rene Cruz, M.D., Watts still complained of

occasional blurry vision, but was significantly improved compared to when she was in the

hospital.  She also had fallen down a few days earlier.  The impression was IDDM, hypertension

and hyperlipidemia.  Her blood pressure was 144/86.  R. 186.  Watts indicated she had memory

problems as well.  R. 187.

Notes from Family Practice Specialists dated October 25, 2000 described Watts as being

in a lot of pain.  R. 125.  She was said to be 50 percent improved on November 9, 2000.  R. 125.

On November 29, 2000, notes indicated Watts had not obtained long term relief from her

symptoms.  R. 122.  She complained of pain with additional night pain, burning in nature.  R.

122.  It was also indicated she had diabetic peripheral neuropathy.  R. 122.  She returned on

December 12, 2000 and was diagnosed with IDDM, neuropathy and hypertension.  R. 123.

A follow-up letter dated February 2, 2001 from Dr. Zikra of the Diabetes and Endocrine

Center of Florida to Dr. Cruz stated Watts's main complaints were dizziness, emotional lability[7],

---

[6]Longsightedness.  STEDMAN'S at 828.

[7]The state of being unstable.  STEDMAN'S at 926.

sweatiness and severe pain in both feet.  Her blood pressure was 130/80.  The impression was

IDDM with recurrent hypoglycemia[8] around lunch time, and menopausal syndrome.  R. 181.

A letter from Dr. Zikra to Dr. Cruz dated March 2, 2001 indicated Watts had severe

painful peripheral neuropathy in both her feet along with muscle cramps and a burning sensation

in her feet.  She also had emotional lability.  Examination revealed a blood pressure of 193/107

and a weight of 224.  The impression was IDDM, muscle cramps and hyperlipidemia.  R. 179.

At the request of DDS, Kimberly Bourne, M.D. completed a questionnaire on April 2,

2001.  Dr. Bourne indicated Watts had decreased sensation to monofilament testing to around her

mid foot bilaterally.  Motor strength was 4/5 in the right quadriceps and 4/5 in the right and left

plantar. Watts had difficulty with fine dexterity. She had a deliberate gait and was unsteady when

walking.  Watts was entirely unable to squat, walk on her toes or walk on her heels.  R. 150.

Dr. Bourne's notes from the Diabetic and Endocrine Center of Florida on April 2, 2001

revealed Watts had intermittent claudication[9], stress incontinence and numbness, tingling and

edema in her extremities.  She had fallen on occasion as well.  Her grip strength had decreased.

She was also positive for new easy bruising.  Her chest was positive for supraclavicular fullness.

Examination of her feet revealed decreased sensation bilaterally and that she was positive for

neuropathy.  R. 176 - 77.

---

[8]An abnormally small concentration of glucose in the circulating blood.  STEDMAN'S at 836.

[9]A condition caused by ischemia of the muscles, characterized by attacks of lameness and pain, brought on by walking, chiefly in the calf muscles; however, the condition may occur in other muscle groups.  STEDMAN'S at 350.

Gregory Samano II, D.O. examined Watts on May 2, 2001.  She had exertional dyspnea.[10]

R. 161.  She was seen on June 12, 2001 and was noted to have edema and dry, cracked, scaly skin

on her feet bilaterally.  R. 157.  An upper abdominal sonogram on June 22, 2001 revealed mild

hepatomegaly[11] with some increased echogenicity of the liver, probably representing fatty change.

R. 155.  Dr. Samano saw Watts on July 9, 2001.  Examination revealed she was positive for

edema and bilateral tenderness over the heels.  She needed to be seen for a podiatry evaluation

due to plantar fasciitis.  She was also noted to have sinusitis and fatty infiltrate in her liver.  R.

154.  Dr. Bourne's notes on August 9, 2001 indicate that Watts's blood sugar increased with

stress or if she was tense.  She also had some fatigue and was emotional.  R. 164.  Examination of

her feet revealed she was positive for neuropathy.  R. 165.  She also had increased pain in her feet

as well as insomnia.  R. 167.

A mental status evaluation by Edmund S. Bartlett, Ph.D. on October 29, 2001 revealed

Watts had come to have difficulty with memory, concentration, and pain since her diabetes

diagnosis.  The diagnosis was that she was in the adjustment phase with respect to her medical

crisis in the fall of 2000.  She was struggling to avoid succumbing to depression or the panic of

anxiety.  She understood one- and two-step instructions when she was calm enough to pay

attention.  Watts had been cooperative with supervisors and co-workers in the past but now was

out of the workplace and in a passive state of noncompliance.  R. 205.

---

[10]Excessive shortness of breath after exercise.  STEDMAN'S at 535.

[11]Enlargement of the liver. STEDMAN'S at 787.

In a letter from Dr. Bourne to Dr. Samano dated November 15, 2001, Dr. Bourne indicated Watts had nausea and an upset stomach with stress from a meeting with a Social Security counselor.  She also had ongoing sweats and increased blood pressure.  R. 275.

Patricia A. Boger, Ph.D. completed a Psychiatric Review Technique form at the request of DDS on November 25, 2001.  R. 206 - 19.  Dr. Boger noted Watts had mild difficulties in maintaining concentration, persistence, and pace.  R. 216.  Boger described Watts's psychiatric issues as "not severe," writing that she had some depressive symptoms, but that they did not appear to be significant enough to interfere with occupational functioning.  R. 218.

On December 21, 2001, Dr. Samano stated Watts was very emotional and moody.  She had increased anger and depression.  R. 276.  Examination revealed she was positive for anger, insomnia and anhedonia.[12]  R. 276.  On January 25, 2002, she was positive for back spasms.  R. 274.  Watts was noted to have depression and migraines.  R. 274.  She stated the Zoloft continued to be effective.  R. 274.  Watts saw Dr. Samano on February 8, 2002 due to increased pain in the left foot over the heel.  R. 272.  She was crying and labile during the examination. R. 272.  She had an extra soft tissue mass over the left medial aspect and tenderness over the right calf.  R. 272.  The diagnosis was plantar fasciitis, major depression, and migraines.  R. 272.  She reported seeing a psychiatrist that day, who had increased her Zoloft prescription.  R. 272.

C. D. Chacko, M.D. completed a psychiatric evaluation on February 8, 2002.  Mental status examination revealed her mood was depressed and tearful.  She exhibited psychomotor retardation, and was very irritable.  Speech was slow, and attention and concentration were

---

[12]Absence of pleasure from the performance of acts that would normally be pleasurable.  STEDMAN'S at 90.

diminished.  The diagnosis was major depression, single episode, and her GAF was 55.[13]  Dr.

Chacko noted that Watts's level of psychosocial stressors was "severe" due to her medical

problems and her unemployment.  R. 267 - 68.

On March 28, 2002, Watts saw Frederick Pearl, D.P.M. of the Orlando Foot & Ankle

Clinic due to left heel pain and a heel spur.  She reported doing well on Diclofenac and a foot

strap.  R. 225.  Watts saw Fred Hyer, M.D. on April 16, 2002 for a rheumatologic evaluation.

She was seen because of a positive ANA and polyarthralgias.  The rheumatoid factor was

negative.  Examination of the wrist showed swelling and tenderness.  The assessment was plantar

fasciitis, tendinitis of the left wrist, IDDM, hypertension, obesity, history of anxiety and

depression, and asthma.  Dr. Hyer ordered updated lab tests to evaluate the positive ANA.  R. 245

- 46.  Dr. Hyer reviewed the lab results on April 19, 2002.  There was a strongly positive ANA,

positive SSA antibody and slightly elevated SGPT.  Clinically, she appeared to have mild

synovitis of the right ankle and left wrist.  R. 239.

On May 3, 2002, Dr. Chacko noted Watts continued to feel depressed.  She was tearful

but not suicidal.  The Restoril was not helping her sleep.  Dr. Chacko increased Watts's Zoloft

and Restoril dosage.  R. 266.

An MRI of the left wrist on June 17, 2002 showed Watts had findings consistent with a

rupture of the extensor carpi ulnaris ("ECU") tendon.  She had extensive interosseous cyst

---

[13]The Global Assessment of Functioning ["GAF"] Scale describes an individual's overall psychological,
social, and occupational functioning as a result of mental illness, without including any impaired functioning due to
physical or environmental limitations.  See DSM-IV at 32.  A GAF code of 51 - 60 indicates "moderate symptoms"
(e.g., flat affect and circumstantial speech, occasional panic attacks) OR  "moderate difficulty in social or occupational
functioning" (e.g., few friends, conflicts with peers or co-workers).  DSM-IV at 32.

formation of the triquetrium with smaller cysts noted in the capitate and base of the first

metacarpal.  R. 271.

Watts went to Jewett Orthopaedic Clinic for an orthopaedic consultation on June 26,

2002.  Her chief complaint was left wrist pain.  Examination revealed very limited range of

motion of the left wrist, with mild to moderate swelling.  She was diffusely tender and any

deviation of the wrist was painful.  She had only 15 to 20 degrees of dorsiflexion and palmar

flexion.  Watts also had decreased grip strength due to pain.  The diagnostic study showed some

cystic changes that appeared in the triquetrum and capitate region.  There MRI of the wrist

showed some definite signal changes throughout the ECU and possibly a complete rupture.  On

the STIR images the physician saw definite cystic changes throughout the triquetrum and possibly

into the capitate as well.  The impression was ECU tendinitis of the left wrist versus a rupture and

history of rheumatoid arthritis.  R. 229.

Dr. Hyer saw Watts for a follow-up visit regarding her arthralgia on July 9, 2002.  She

complained of pain in both wrists, especially on the left side, and in the ankles.  Joint

examination revealed swelling and tenderness of the left wrist and pain upon passive range of

motion.  The assessment was tendinitis of the left wrist and polyarthralgias.  R. 270.

Records from Dr. Deren at Jewett Orthopaedic Clinic on July 9, 2002 indicated Watts had

persistent ulnar-sided wrist pain.  Examination revealed moderate swelling over the ulnar aspect

of the wrist.  She had pain at the extremities of pronation/supination and ulnar deviation.  She had

pain at the extremes of motion and most of her difficulty was with range of motion.  Watts was

most bothered by deviation of the wrist, particularly ulnarly, and had a total arc of motion about

-29-

30-40 degrees.  Previous x-rays were reviewed and showed some mild cystic formation within the

bones.  Review of the MRI showed significant heterogenous changes within the ECU tendon with

possible rupture and significant fluid around it.  The impression was that most of her left wrist

symptoms stemmed from an ECU tendon rupture, likely related to Watts's rheumatoid arthritis.

R. 226.

Dr. Samano examined Watts on July 24, 2002.  She had a bad headache, chest pain and a

dry cough.  Her right wrist was tender.  Watts had inflammatory arthritis and tendonitis.  R. 269.

Notes on August 14, 2002 indicate that Watts was seen at Jewett Orthopaedic Clinic for

continued evaluation and management of her wrist.  She had increasing complaints in both wrists.

On examination she was tender over the ECU tendon and had some discomfort at the extremes of

motion.  The doctor was concerned about the progressive symptoms of tingling and numbness.

R. 255.

On August 21, 2002, Dr. Hyer saw Watts, who was complaining of generalized arthralgias

and headaches.  She also complained of intermittent numbness in the hands and stated she had a

lot of anxiety and "passed out" when she was outside.  It was noted she was depressed due to her

inability to function as fully as she used to.  Dr. Hyer noted that Watts had splints on both wrists.

The impression was arthralgias, osteoporosis, bilateral carpal tunnel syndrome per patient's

report, chronic anxiety and tendinitis of the left wrist.  R. 235.

Dr. Chacko completed a "Medical Opinion Re: Ability to do Work-Related Activities"

form on August 21, 2002.  He described Watts as having "poor or none" of the following mental

abilities and aptitudes: ability to remember work-like procedures; to maintain attention for two-

hour segments; to maintain regular attendance and be punctual within customary, usually strict

tolerances; to work in coordination with or proximity to others without being distracted by them;

to complete a normal workday and workweek without interruptions from psychologically based

symptoms; to perform at a consistent pace without an unusual number and length of rest periods;

to get along with coworkers or peers without unduly distracting them or exhibiting behavioral

extremes; to understand and remember detailed instructions; to carry out detailed instructions; to

deal with the stress of skilled and semiskilled work; and to travel in unfamiliar places.  R. 220 -

21.

  Dr. Chacko described Watts as having a "fair" ability or aptitude to understand, remember

and carry out very short and simple instructions; to sustain an ordinary routine without special

supervision; to make simple work-related decisions; to ask simple questions or request assistance;

to accept instructions and respond appropriately to criticism from supervisors; to respond

appropriately to changes in a routine work setting; to deal with normal work stress; to be aware of

normal hazards and take appropriate precautions; to set realistic goals or make plans

independently of others; to interact appropriately with the general public; to maintain socially

appropriate behavior; to adhere to basic standards of neatness and cleanliness; and to use public

transportation.  Although the form allowed the physician to describe the patient as having

"unlimited", "very good," or "good" abilities or apititudes, Dr. Chacko did not describe Watts as

possessing more than a "fair" ability or aptitude in any category.  Dr. Chacko ascribed Watts's

limitations to her mood swings, easy distraction, poor concentration, psychomotor retardation,

forgetfulness, irritability and easy confusion.  R. 220 - 21.  Dr. Chacko noted on August 23, 2002

that Watts was having carpal tunnel problems and her mood was euthymic.  R. 223.

On August 27, 2002 Watts presented to Jewett Orthopaedic Clinic for continued

evaluation and management of bilateral carpal tunnel syndrome.  She reported frequent dropping

of objects and frequent numbness and tingling in the fingers.  On examination she had positive

Tinel's, Phalen's and nerve compression tests.  The impression was very symptomatic bilateral

carpal tunnel syndrome.  Watts reported being very concerned about proceeding with surgery due

to her diabetes and a fear of resulting infection or slow recovery time.  R. 253.

Examination by Dr. Hyer on October 2, 2002 revealed pain in her knees, ankles, wrists

and hands.  Watts reported continuing pains in her knees, ankles, wrists and hands, as well as

intermittent numbness in both hands.  There was trace crepitus on motion of the knees and she

was tender over both knees and ankles.  The diagnosis was polyarthralgias, IDDM, carpal tunnel

syndrome and history of tendinitis of the left wrist.  R. 234.

On November 5, 2002, Dr. Chacko saw Watts, who reported that she had not been

sleeping much.  She also had increased anxiety with panic attacks and was upset about her pain

and carpal tunnel syndrome.  Her mood was dysphoric.  She had increased anxiety with panic

attacks. R. 264.  On November 13, 2002 Watts complained to Dr. Hyer of pain in her shoulders,

feet, hands and knees.  The joint exam revealed tenderness in her left wrist, shoulders and ankles.

The assessment was polyarthralgias, osteoporosis, positive ANA with no clinical evidence of

collagen vascular disease and persistent left wrist pain.  R. 230.

On December 4, 2002 notes from Jewett indicate that Watts had a positive Phalen's and Tinel's sign and mild thenar[14] wasting.  The impression was longstanding carpal tunnel syndrome, bilaterally.  R. 252.  On December 5, 2002, Watts had a surgical left open carpal tunnel release procedure.  R. 251.  On December 30, 2002, Dr. Chacko noted that, despite the surgery, Watts's anxiety persisted and she had poor energy levels.  R. 264.

She went to Jewett Orthopaedic Clinic on January 8, 2003 for an ongoing evaluation and management of carpal tunnel syndrome.  She continued to have problems with scar sensitivity, swelling and continued numbness and tingling in the fingers.  Examination revealed she was still moderately swollen and tender.  She had limited digital flexion due to pain.  R. 249.

Tracey G. Henley, Psy.D. saw Watts for a psychological evaluation on February 26, 2003. Watts stated she could not drive due to inability to concentrate and anxiety while driving.  Watts was not able to independently complete her activities of daily living and stated that she frequently stayed at home with the drapes shut.  She said family household chores were complicated due to physical issues and because she broke out from using any chemicals.  Watts used a cane to ambulate.  On mental status examination she described her mood as angry, nervous, and depressed.  She reported feeling useless since becoming unable to work.  She scored in the low average range for memory and the borderline range for attention and concentration.  On the Beck Depression Inventory her score indicated a severe level of depression.  She reported occasional thoughts of killing herself and crying all the time.  Scores in the Beck Anxiety Inventory

---

[14]Term applied to any structure in relation with the base of the thumb or its underlying collective components. STEDMAN'S at 1795.

indicated she had a severe level of anxiety.  Dr. Henley noted that the Beck Depression Inventory

score and the Beck Anxiety Inventory score indicated clinical levels of depression and anxiety.

The diagnostic impression was adjustment disorder with anxiety and depressed mood.  R. 256 -

59.

Dr. Henley also completed a "Medical Source Statement of Ability to do Work Related

Activities (Mental)" form.  Dr. Henley found that Watts had slight difficulties in understanding,

remembering and carrying out detailed instructions; interacting with the public, interacting

appropriately with supervisors and co-workers and responding appropriately to changes in a work

setting.  She had moderate difficulty in being able to make judgments on simple work-related

decisions and being able to respond appropriately to changes in work pressures in a routine work

setting.  Dr. Henley noted Watts had difficulty with observed and assessed memory and became

distressed when she could not remember.  She related with anxiety, was observed clinically to cry

easily and was emotionally labile.  Dr. Henley noted Watts would likely have difficulty accepting

feedback from an employer due to an overly emotional response, difficulty with mental

composure in any mental crisis and difficulty with increased depression if she made a mistake at

work.  R. 260 - 61.  On February 27, 2003, Dr. Chacko noted that Watts's chronic dysphoria

persisted.  R. 263.

### B.     The Analysis

Watts contends that the ALJ's decision, particularly his analysis of her RFC, is not based

on substantial evidence.  Docket No. 11 at 12.  Watts' brief, however, does little to grapple with

the reasoning of the ALJ.  Rather, Watts simply lists all of the medical evidence of her physical

-34-

and mental ailments, and then concludes that she is therefore unable to work.  Docket No. 11 at

12 - 15.  For example, Watts notes that her diabetes "caused her to have painful diabetic

neuropathy in her feet" which "resulted in severe pain in both feet and swelling and numbness

that has resulted in . . . falling on numerous occasions."  Docket 11 at 12.  Providing record

citations to support these statements, Watts concludes that these problems "would clearly affect[]

her ability to perform light work that requires 6 hours of standing a day."  Docket 11 at 12.  She

repeats these steps over four pages in regard to every ailment she suffers  —  nearly half of her

argument.

      With a single exception,[15] Watts does not tie her argument to the ALJ's decision.

Moreover, she never addresses the evidence relied upon by the ALJ in assessing her RFC.  The

recitation of a list of evidence that supports Watts's position does not demonstrate that the ALJ's

position lacks support in the record.  It is not this Court's role to weight the evidence, or to

assemble Watts' argument for her.  As such, Watts's general argument, that the ALJ's decision is

not based on substantial evidence, fails.

      Watts next argues that the ALJ did not properly evaluate her subjective complaints of

pain.  Docket 11 at 15.   Here, Watts does address the evidence relied upon by the ALJ, and her

argument has merit.  In assessing Watts's subjective complaints, the ALJ found:

> The claimant testified that she collapsed due to her diabetes in September 2000.
> She has a problem with balance and she has neuropathy.  She was diagnosed with

---

[15]The only instance in those four pages where Watts addresses a particular point raised by the ALJ occurs on page 13: "Contrary to the ALJ's suggestion Plaintiff's carpal tunnel had improved due to her left hand surgery, it was indicated Plaintiff still had to obtain surgery for her right hand as well.  Furthermore, the doctor noted her recovery was limited by her diabetes and that her condition may fail to improve at all.  R. 249."  Immediately after this passage, Watts returns to simply chronicling her ailments and stating that they show she was disabled.

carpal tunnel syndrome and had surgery on the left on December 5, 2002.  She is right handed.  She is on blood pressure medication.  She has numbness in the left arm and chest pain.  She has a problem with her feet after walking 2 blocks.  Her hands and mental condition keep her from working.  The claimant's husband testified that she has a problem holding things.  She has a balance problem and has fallen.  She gets dizzy and disoriented.  She becomes frustrated with her inability to do things.  He does the laundry, vacuums and cooks.

In determining the weight to give the claimant's testimony under the guidelines of Social Security Ruling 96-7p, the undersigned notes that her treating physicians have not reported any specific limitations of function of an exertional nature.  She has a positive ANA and has been treated for polyarthraligias and tendinitis of the left wrist.  She underwent surgery for the carpal tunnel of the left wrist and this was slowly resolving.  Prior to and after surgery there was full range of motion on the wrist on every examination.  She is right handed.  There is evidence of only two visits to the podiatrist for complaints related to her feet.  The first time she was reported to be doing well and the second visit was for dermatitis of the right foot.  These records do not support her allegation of an inability to walk more than 2 blocks without problems.  The treatment records show that her blood pressure and diabetes have remained under good control.  The evidence fails to document her complaint of balance problems.  Overall, her testimony can be given limited weight due to the lack of supportive evidence.

R. 26.

The ALJ must consider all of a claimant's statements about her symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence. The Court cannot conclude that the ALJ has done so in this case because the ALJ barely addressed the objective medical evidence.

Watts is correct that, in evaluating her hand problems, the ALJ failed to note that Watts had suffered bilateral carpal tunnel syndrome, R. 253, that she was still scheduled to have carpal tunnel surgery on her right (dominant) hand, R. 299, and that her doctor indicated that her diabetes was limiting Watts's recovery from the earlier carpal tunnel surgery and might prevent full recovery, R. 249.  The ALJ noted that Watts had a full range of motion in her wrist before the

surgery, but did not address her persistent reports of hand and wrist problems such as pain, numbness, tingling, swelling, reduced range of motion in her fingers and hands and reduced grip strength.  R. 176, 192 - 94, 226, 229, 234, 235 245 - 46, 253, 269, 270.  The ALJ also failed to note that Watts had only 15 to 20 degrees of dorsiflexion[16] and palmar flexion[17] prior to her surgery.  R. 229.  In discrediting Watts' complaints of foot pain, the ALJ noted that she had made only two trips to the podiatrist, and only one of those trips involved a pain complaint.  However, Watts repeatedly complained of foot pain to her other physicians.  R. 154, 167, 176, 179, 181, 234, 270, 272.

The ALJ stated that treatment records showed Watts's diabetes and hypertension have remained under good control.  R. 26.  Even if this were true — and the ALJ cites no medical records that would assist this Court in confirming it — it ignores problems such as foot pain and dizziness alleged to have arisen from Watts's diabetes and hypertension.  The ALJ concludes that Watts' balance complaints are not supported by the record, but does not address Watts's repeated complaints to her physicians about foot numbness, dizziness, unsteadiness, intermittent claudication, and falling.  R. 150, 176, 181, 187, 192 - 94.  In short, the ALJ did not properly determine and articulate the extent to which Watts's symptoms were consistent with the objective medical evidence.  Remand is required to allow the ALJ to address this issue.

Similarly, the Court finds merit in Watts's argument regarding the weight given to the testimony of her treating pyschiatrist, Dr. Chacko.  Docket 11 at 18 - 20.  The ALJ gave limited

---

[16]Turning upward of the foot or toes or of the hand or fingers.  STEDMAN'S at 517.

[17]Turning the hand or fingers toward the palmar surface.  STEDMAN'S at 663.

weight to Dr. Chacko's August 2002 "Medical Opinion Re: Ability to do Work-Related Activities", R. 220 - 21, on the grounds that the limitations expressed in that report were not supported by Dr. Chacko's office visit records or the remainder of the medical evidence.  R. 24. However, it appears that a large portion of Dr. Chacko's office visit records were not before the ALJ at the time he drafted the opinion at issue.  A psychiatric evaluation dated February 8, 2002, R. 267 - 68, and notes of ten office visits from March 2002 to June 2003 were submitted to the Appeals Council after the ALJ's decision.  R. 4.  The Appeals Council properly made the evaluation and the office notes part of the record, R. 8, and considered them in denying review, R. 5.  However, the Appeals Council does not discuss those documents in its denial of review, and does not state what weight it gave to Dr. Chacko's opinion, or its impact on Watts's RFC.

The medical records of Dr. Chacko which the AC considered do relate to the relevant period under consideration by the ALJ.[18]  According to the regulations, if a claimant submits evidence that does not relate to the relevant period under consideration, "the Appeals Council will return the additional evidence to [the claimant] with an explanation as to why it did not accept the additional evidence and will advise [the claimant] of [her] right to file a new application."  20 C.F.R. § 404.976 (b)(1)(2005).  The AC did not return the AC evidence to Watts.  Rather, the AC considered the evidence — most likely because the evidence quite obviously *did* relate to the relevant period.

---

[18]The Commissioner argues that this Court may not consider evidence that was never submitted to the ALJ. Docket No. 12 at 7.  It is unclear whether the Commissioner argues that AC evidence that post-dates the ALJ's decision can *never* relate to the period under consideration before the ALJ's decision.  If that is in fact the Commissioner's argument, this Court rejects it as contrary to the language of her own regulation.

The AC, however, erred in determining that the Appeals Council evidence "does not provide a basis for changing the Administrative Law Judge's decision," and in finding no reason even to review the ALJ's decision.  R. 5 - 6.  As Watts's board certified treating psychiatrist, Dr. Chacko's clinical impressions should be highly relevant and probative of Watts's impairments. After all, Dr. Chacko's opinions relate to the very period considered by the ALJ.  Under the law cited above, the opinion of a treating physician is entitled to significant weight under most circumstances.  The Commissioner is simply incorrect that this Court must ignore the AC evidence.[19]  Docket No. 12 at 7.

This Court should therefore remand this case to the Commissioner under sentence four of 42 U.S.C. § 405 (g).[20]  The Court cannot discern the basis for the Commissioner's decision that the Appeals Council evidence — which includes the treating psychiatrist's opinion as to Watts's impairments and capacity — did not warrant a change in the ALJ's decision, or even a review.

---

[19]Without doubt, the Appeals Council may enter an order "denying a request for review" and may adopt the ALJ's decision as the final decision of the Commissioner.  *See e.g.*, R. 5.  Indeed, the Appeals Council may inform the claimant that it is "denying a request for review" even where the Appeals Council has in fact — as requested — engaged in a significant and detailed review of the applicable laws, regulations, statutes, rulings, the ALJ's decision, the medical records, hearing transcripts, and the arguments on appeal.  The Appeals Council may state that it is "denying a request for review" even when it has in fact done a full analysis as to whether the ALJ appears to have abused his or her discretion, has made a legal error, has not supported his or her decision by substantial evidence, and has contravened broad policy.

The Appeals Council may even state that it is "denying a request for review" even when it has in fact received and analyzed new and material evidence, and fully reviewed whether the ALJ's decision is contrary to the weight of all the evidence now in the record.  In short, the Appeals Council's final order may adopt the ALJ's decision and language as the final decision of the Commissioner, and the Commissioner may adopt a regulation says so.  But the Appeals Council simply cannot review an ALJ's decision on appeal, and then insulate itself from appellate review of its decisions under 42 U.S.C. § 405 (g) by asserting that it has "found no reason under our rules to review the Administrative Law Judge's decision [and therefore] we have denied your request for review."  *See, e.g.*, R. 5.

[20]Watts also has established:  1.) that there is new, non-cumulative evidence; 2.) that the evidence is material — relevant and probative so that there is a reasonable possibility that it would change the administrative result; and 3.) she did in fact submit the evidence at the administrative level. The Court has discretion to remand also under sentence six, but finds reason to do so because the sentence four remand is fully adequate.

The Commissioner's final decision is not supported by substantial evidence, and the Commissioner incorrectly applied the law relevant to Watts's disability claim.  On remand under sentence four, the Commissioner should review the case on a complete record (at the Appeals Council or ALJ level), including any new material evidence.  *Diorio v. Heckler*, 721 F.2d 726, 729 (11th Cir. 1983); *Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984).

Watts's final argument — that the ALJ failed to consider the impact of her obesity on her ability to work — is not supported by the record.  No physician indicated that Watts's weight had any effect on her ability to work, and Watts herself offers no evidence that it does so.  The Court finds no error in the ALJ's lack of discussion of Watts's obesity.

## VI.    CONCLUSION

For the reasons stated above, the decision of the Commissioner should be **REMANDED** under Sentence Four for further proceedings not inconsistent with this opinion.

Failure to file written objections to the proposed findings and recommendations in this report pursuant to 28 U.S.C. § 636 (b)(1) and Local Rule 6.02 within ten days of the date of its filing shall bar an aggrieved party from a *de novo* determination by the district court of issues covered in the report, and shall bar an aggrieved party from attacking the factual findings on appeal.  Any party appealing this decision shall file and serve a copy of the oral argument

-40-

transcript within thirty days of this order.

**DONE AND ORDERED** this 28th day of July, 2005.

JAMES G. GLAZEBROOK
UNITED STATES MAGISTRATE JUDGE

The Court Requests that the Clerk
Mail or Deliver Copies of this Report and Recommendation to
All Counsel of Record and *Pro Se* Litigants,
and to:

The Honorable Patricia C. Fawsett
United States District Judge

Mary Ann Sloan, Chief Counsel
Dennis R. Williams, Deputy Chief Counsel
Paul Jones, Assistant Regional Counsel
Office of the General Counsel, Region IV
Social Security Administration
61 Forsyth Street, S.W., Suite 20T45
Atlanta, Georgia        30303-8920

Susan Roark Waldron
Assistant United States Attorney
400 N. Tampa St., Suite 3200
Tampa, FL              33602

The Honorable James R. Ciaravino
Administrative Law Judge
c/o Social Security Administration
Office of Hearings and Appeals
Suite 300, Glenridge Building
3505 Lake Lynda Drive
Orlando, FL            32817

-41-